IN THE SUPREME COURT OF MISSISSIPPI
NO. 93-CA-01086-SCT

*MARIE J. SARVER*

*v.*

*ROY C. SARVER*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/24/93 |
| TRIAL JUDGE: | HON. JOHN C. ROSS JR. |
| COURT FROM WHICH APPEALED: | PONTOTOC COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | GENE BARTON |
| ATTORNEY FOR APPELLEE: | STEPHANIE J. LAWRENCE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 1/30/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 2/20/97 |

**BEFORE DAN LEE, C.J., PITTMAN AND SMITH, JJ.**

**LEE, CHIEF JUSTICE, FOR THE COURT:**

## SUMMARY

¶1. This is an appeal from a divorce case heard in the Chancery Court of Pontotoc County, Mississippi. The parties in this case stipulated to a divorce on the grounds of irreconcilable differences. At the time of separation, their residence and legal homestead was deeded to Roy C. Sarver and Marie J. Sarver as tenants by the entirety with the right of survivorship and not as tenants in common. The lower court divested the title of Marie J. Sarver, and found that the property was worth approximately $80,000. Marie was awarded an equitable lien against the property in the amount of $16,000 payable in four annual installments in the amount of $4,000 each. Furthermore, the chancellor did not award any attorney's fees to Marie.

¶2. On appeal, Marie raises the following assignments of error:

> **1. THE CHANCERY COURT ERRED IN NOT AWARDING MARIE A ONE-HALF INTEREST IN THE PARTIES' HOME WHERE THE PROPERTY WAS DEEDED AND TITLED TO BOTH AS JOINT TENANTS IN THE ENTIRETY, AND**

> **2. THE CHANCERY COURT ERRED IN NOT AWARDING MARIE ATTORNEY'S FEES.**

On cross-appeal, Roy raises the following issues:

**1. THE CHANCERY COURT ERRED IN AWARDING MARIE AN EQUITABLE LIEN AND ERRED IN FAILING TO COMPLETELY DIVEST HER OF ALL HER INTEREST IN THE PROPERTY OR AWARD RAY AN EQUITABLE LIEN AGAINST ALL OF HER INTEREST IN THE PROPERTY, AND**

**2. THE CHANCERY COURT ERRED IN AWARDING MARIE LUMP SUM ALIMONY.**

## STATEMENT OF THE CASE

¶3. Roy Sarver filed a complaint for divorce on or about May 18, 1992, which was amended on June 22, 1992. Marie J. Sarver filed her answer and cross-complaint for divorce on September 3, 1992. The parties agreed to a divorce on the grounds of irreconcilable differences and entered into an agreement wherein the court could decide all issues concerning property distribution and attorney's fees. On July 14, 1993, the matter was heard in the Chancery Court of Pontotoc County, and the parties were granted a divorce. The court divested Marie of title to the real estate and denied her attorney's fees. The court awarded Marie an equitable lien against the property in the amount of $16,000 and further awarded her $2,500 in lump sum alimony.

¶4. Marie is appealing the court's decision, contending the court erred in not awarding her a one-half interest in the property and failing to award attorney's fees. The appellee/cross-appellant, Roy, is appealing the court's decision, contending the court erred by awarding Marie a $16,000 equitable lien against real estate and by awarding her lump-sum alimony.

## STATEMENT OF THE FACTS

¶5. In 1980, Roy Sarver, sixty-five years of age at the time, retired from teaching school in California. Following his retirement he met Marie, a licensed real estate broker, who owned and operated her own real estate business. Shortly after they met, she borrowed $6,000 from Roy to use in her real estate business.

¶6. That same year Roy married Marie, who was then fifty-two years of age. Unknown to Roy, at the time of their marriage, Marie was experiencing financial difficulties with her business. Marie again borrowed money from Roy in the amount of $387 for a telephone bill attributable to her business.

¶7. Within the first five and a half months of the marriage, Marie closed her business and filed for bankruptcy protection. Subsequently, they traveled throughout the country for approximately eighteen months and eventually settled in Mississippi. Roy entered into a real estate contract on May 13, 1982, to purchase 78 acres of land in Pontotoc County for $31,600. It was agreed that, due to her expertise in real estate transactions, Marie would handle the paperwork of the purchase transaction. Roy was allegedly not aware that Marie had placed her name on the contract until their separation. The $10,000 down payment for the 78 acres came from a $25,000 down payment he received from the sale of the California home which he owned individually prior to the marriage. For a year and a half the monthly payments of $208.46 on this contract were made by Roy from the remaining funds acquired from the down payment he received on the sale of his California home. On

or before February, 1984, Roy paid the balance of $21,015.33 from the final $75,000 pay-off that he received from the sale of his California home. During the court proceedings, Marie admitted that she did not contribute financially to the purchase of the real estate and improvements.

¶8. As this was Roy's third marriage and all the funds used to purchase the property were his, and all were accumulated prior to this marriage, it was his desire to leave the real estate to his three children from previous marriages, with the "understanding" that Marie could live on it for her lifetime if she remained married to him. This was allegedly discussed with Marie and, according to Roy and his daughter, Sharon Sarver, Marie was in agreement. The original deed to the subject property was in Roy's name alone.

¶9. After the purchase of the property, Roy developed serious heart problems. Marie allegedly convinced him that, if he were to die without putting the property in their names jointly, the property would be tied up in probate for years until there was very little left for his children. Marie promised that she would see to it that his children got the property. Roy trusted her advice, due to her expertise in the field of real estate, and agreed to the conveyance.

¶10. Shortly after the conveyance Marie started having problems with the Internal Revenue Service because she had not paid a federal tax debt due from her previous marriage. Roy and Marie conveyed the property back into Roy's name alone, to avoid the IRS attaching Marie's property.

¶11. Ultimately, the IRS did collect Marie's previous tax debt of $1,858.97 by attaching and taking it from Roy's savings. Thereafter, the property was reconveyed into both names, again, to keep the property out of probate should he die from his ongoing heart and prostate cancer problems.

¶12. Although Roy spent $85,000 on the property and materials for the residence, it was only valued at $80,000. Roy contends that he personally did eighty to ninety percent of the construction of the home with the knowledge gained through his past business as a residential contractor. No records were kept as to the amount of time that each party actually spent on the construction site and on the project. With the exception of some concrete work that was subcontracted by Roy, all of the labor on the house was done by Roy, Marie and a neighbor who assisted. Roy contends that Marie did about three percent of the work on the construction. The testimony reveals that, in payment for work done on the house by Roy's neighbor, Roy furnished him with beer and would bushhog the neighbor's land for him. Marie contends that she was involved in many phases of the construction of the house, which lasted over five years.

¶13. Roy's net worth at the time of the marriage was in excess of $285,356, which included a teacher's retirement account worth more than $182,149 (which was depleted during the course of the marriage) and a home in Sacramento, California, from which Roy realized an equity of more than $100,000 upon its sale.

¶14. Roy's net worth at the time of his divorce from Marie was much less than at the time of the marriage. He has a home valued at $80,000. Other than the marital residence, Roy has no assets except those listed as having no value or very little value, which include a 1972 Ford pick-up truck, a 1974 Volkswagen which is barely operational, and a 1973 recreational vehicle, all of which he owned individually prior to the marriage. He has a 1974 Massey-Fergusen tractor, which has a value of approximately $1,000, and a 1983 Ford car of very little value. At the time of the hearing, the

recreational vehicle was being used as collateral on a $4,500 loan.

¶15. At the time of the marriage Marie did not own a vehicle, she had no income, and after the close of her real estate business she failed to seek other employment. During the course of the marriage the living expenses were paid by monies Roy had set aside prior to this marriage from retirement funds earned prior to this marriage. Neither party was employed during the marriage. Roy cooked his own breakfast and Marie cooked their dinner. Marie had the benefit of living off Roy's retirement and investments. Neither party earned any income during the marriage. The only household furnishings purchased during the marriage were a dinette set, two recliner chairs, a couch for the basement, end tables, lamps, three TV sets, a VCR and appliances.

¶16. In May of 1992, Marie left the marriage and moved back to California of her own volition, taking with her only what she and her daughter could carry in a rented car.

¶17. At the time of the hearing, Marie was sixty-five and in relatively good health. The hearing testimony revealed that Marie had no serious medical problems that would keep her from obtaining gainful employment. She was capable and qualified to re-enter the field of real estate. At the time of the hearing, she was receiving monthly Social Security payments of approximately $101 per month, from Roy's premarital earned income.

¶18. At the time of the hearing Roy was a retired seventy-three-year-old heart patient with prostate cancer. He was not capable of gainful employment. He had no income other than Social Security and his teacher's retirement, which was earned prior to this marriage and at the time of the hearing amounted to $1,153 a month. His monthly expenses amounted to $1,458, an amount which exceeded his retirement and Social Security income by $305 per month. Roy had no funds with which he could have paid any alimony. Roy received financial assistance to meet his monthly expenses from his daughter, who occasionally lived with him.

¶19. After hearing all of this testimony the chancellor found that the property was worth $80,000 and granted Marie an equitable lien on the property in the sum of $16,000 payable in annual installments of $4,000 each. Although not specifically outlined in the chancellor's opinion, this figure appears to have been derived by subtracting the land value of $31,600 from the total property value of $80,000, leaving the value of the house to be $48,400. One-half of this amount is $24,200. Subtract the approximate $8,000 in monies Roy lent to Marie for her business, and approximately $16,000 remains. In sum, Marie received an equitable lien equivalent to one-half the value of the house less monies lent to her by Roy.

¶20. No findings are provided explaining the chancellor's award of $2,500 in lump-sum alimony. It is reasonable to infer that this sum was awarded based on Marie's estimated monthly costs of living in the sum of $2,313.50, and was allowed in an effort to assist her in "getting a new start" in California.

¶21. At the hearing, the parties agreed that the sum of $2,500 would be a reasonable figure for attorney's fees, but Roy disputed his liability for such fees. The chancellor did not award any attorney's fees to Marie.

¶22. Aggrieved by the chancellor's findings, opinion and judgment, Marie and Roy timely perfected their respective appeal and cross-appeal.

<u>**STANDARD OF REVIEW**</u>

¶23. This Court's scope of review in domestic relations matters is limited. *Crow v. Crow*, 622 So. 2d 1226 (Miss. 1993). "Findings of a Chancellor will not be disturbed or set aside by this Court on appeal unless we are of the opinion the decision made by the trial court was manifestly wrong and not supported by substantial, credible evidence, [citations omitted], or unless an erroneous legal standard was applied." *Pittman v. Pittman*, 652 So. 2d 1105 (Miss. 1995); *Jernigan v. Jernigan*, 625 So. 2d 782, 784 (Miss. 1993); *Snow Lake Shores Property Owners Corp. v. Smith*, 610 So. 2d 357, 360 (Miss. 1992).

<u>**DISCUSSION OF THE LAW**</u>

**-- <u>APPEAL</u> --**

**ASSIGNMENT OF ERROR NO. 1**

**THE CHANCERY COURT ERRED IN NOT AWARDING MARIE A ONE-HALF INTEREST IN THE PARTIES' HOME WHERE THE PROPERTY WAS DEEDED AND TITLED TO BOTH AS JOINT TENANTS IN THE ENTIRETY.**

¶24. Marie argues that the chancellor erred in divesting her of title in the subject real estate and finding that her only interest in the property was an equitable lien in the amount of $16,000. Citing *Miller v. Miller*, 298 So. 2d 704 (Miss. 1974), Marie contends that when one spouse purchases property while married and the married couple takes the property as joint tenants, there is a rebuttable presumption of a gift to the other spouse of a one-half interest in the property so acquired. Marie also contends that, although she may not have made financial contributions to acquiring the subject property, she did provide services and made in kind contributions. Citing *Johnson v. Johnson*, 550 So. 2d 416 (Miss. 1989), Marie argues that the courts must consider the non-economic contributions she made towards acquiring and improving the property.

¶25. Roy counters, asserting that the chancellor did not err in failing to award Marie a one-half interest in the subject property. In fact, he cross-appeals on this issue. The cross-appeal will be discussed as a separate assignment of error. On appeal, Roy contends that the chancellor found that Roy did not make a gift of a one-half interest in the residence to Marie, therefore effectively rebutting the presumption. Citing *Ferguson v. Ferguson*, 639 So. 2d 921, 930 (Miss. 1994), Roy asserts that this Court is required to respect the findings of fact made by the chancellor which are supported by credible evidence and not manifestly wrong.

¶26. Marie's reliance on *Miller* and *Johnson* is misplaced. Both cases are distinguishable as they both concerned marital situations where the complaining spouse contributed substantial amounts of money towards the purchase of the marital home. This Court, in *Miller*, stated that the presumption that a deed from one spouse to the other is gift may be overcome by clear and convincing evidence. *Miller*, 298 So. 2d at 706-07.

> The Chancery Court has authority, where equities so suggest, to order a fair division of property accumulated through joint contribution and efforts of the parties. *Flowers v. Flowers*, 624 So. 2d 992 (Miss. 1993); *Brown v. Brown*, 574 So. 2d 688, 690 (Miss. 1990); *Brendel v.*

*Brendel*, 566 So. 2d 1269, 1273 (Miss. 1990). A spouse is not automatically entitled to an equal division of jointly accumulated property. *Brown v. Brown*, 574 So. 2d at 691; *Dillon v. Dillon*, 498 So. 2d 328, 330 (Miss. 1986). The matter is committed to the discretion and conscience of the chancellor, having in mind all the equities and other relevant facts and circumstances. *Jernigan v. Jernigan*, 625 So. 2d 782; *Brown v. Brown*, 574 So. 2d at 691; *Robinson v. Irwin*, 546 So. 2d 683, 685 (Miss. 1989).

The Court seeks equity by reference to the economic contribution made by each to the acquisition and maintenance of the property, and may not disregard a spouse's economic contributions just because they were not monetary in form. *Johnson v. Johnson*, 550 So. 2d 416, 420 (Miss. 1989); *Regan v. Regan*, 507 So. 2d 54, 56 (Miss. 1987); *Pickle v. Pickle*, 476 So. 2d 32, 34 (Miss. 1985).

*Pittman v. Pittman*, 652 So. 2d 1105, 1109-10 (Miss. 1995) (quoting *Davis v. Davis*, 638 So. 2d 1288, 1292 (Miss. 1994)). "A spouse who has made a material contribution toward the acquisition of property which is titled in the name of the other may claim an equitable interest in such jointly accumulated property incident to a divorce proceeding." *Jones v. Jones*, 532 So. 2d 574, 580 (Miss. 1988). *See Watts v. Watts*, 466 So. 2d 889, 890-91 (Miss. 1985).

¶27. In the case at bar, there is clear and convincing evidence that Roy never intended to make the home a gift to Marie by conveying fee simple title to her. Instead, it was his intention of conveying to her only a life estate contingent upon her remaining married to him until the time of his death. Testimony from the divorce hearing reveals that Roy had three children from a previous marriage and that he wanted the property to go to his children upon his death. Marie would have a life estate contingent on her being married to Roy at the time of his death. In addition, when the Sarvers married, Roy brought proceeds from the sale of his former residence and his retirement funds into the marriage. The funds used to purchase the property and the materials used in the construction of the house were earned by Roy outside and prior to the marriage.

¶28. There was sufficient credible evidence to support the chancellor's finding that:

After the marriage, Roy sold his California home and the parties . . . eventually settl[ed] in Pontotoc County where they constructed a new home on 79 acres with money Roy derived from the sale of his California home.

The title to this home and real property was originally in Roy's name only when purchased in May 1982; in July 1982, Roy placed the title in both his and Marie's name because Roy was having heart trouble and was afraid if he died, the real property would be tied up in probate. In October, 1982, Roy and Marie placed the title back in Roy's name because of Marie's problem with the Internal Revenue Service. Then, again in July 1983, Roy placed the title to the real estate back in his and Marie's name because of Roy's heart problems.

. . . .

Roy . . . considers that Marie has only a life estate in the property.

¶29. Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

### THE CHANCERY COURT ERRED IN NOT AWARDING MARIE ATTORNEY'S FEES.

¶30. Marie contends that the chancellor abused his discretion in not awarding her attorney's fees where the proof was uncontradicted that she did not have the funds to hire an attorney.

¶31. Roy counters that the chancellor did not err in failing to grant Marie an award of attorney's fees. It is Roy's contention that, although not specifically stated in the chancellor's opinion, the chancellor properly determined that Roy was not financially able to pay any attorney's fees, that he was not physically able to work and was not gainfully employed.

¶32. In *Pittman v. Pittman*, this Court outlined the scope of review of a chancellor's award or failure to award attorney's fees.

> "Generally the award of attorney's fees in a divorce case is left to the discretion of the trial court." *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994) (quoting *Cheatham v. Cheatham*, 537 So. 2d 435, 440 (Miss. 1988)). "We are 'reluctant to disturb a chancellor's discretionary determination whether or not to award attorney fees and of the amount of [any] award.' " *Ferguson v. Ferguson*, 639 So. 2d at 937 (Miss. 1994) (quoting *Geiger v. Geiger*, 530 So. 2d 185, 187 (Miss. 1988)).

*Pittman v. Pittman*, 652 So. 2d 1105, 1111 (Miss. 1995).

¶33. Although the *Ferguson* decision had not been rendered at the time of the hearing in the case *sub judice*, it does provide guidance in this matter:

> The question of attorney fees in a divorce action is a matter largely entrusted to the sound discretion of the trial court. *Smith v. Smith*, 614 So. 2d 394, 398 (Miss. 1993); *Kergosien v. Kergosien*, 471 So. 2d 1206, 1207 (Miss. 1985). "If a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." *Martin v. Martin*, 566 So. 2d 704, 707 (Miss. 1990). *See also Jones v. Starr*, 586 So. 2d 788, 792 (Miss. 1991) ("Generally, it is true that, unless the party can establish inability to pay, attorney's fees should not be awarded by the court."). The criteria to be utilized in determining attorney fees are found in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982).

*Ferguson*, 639 So. 2d at 937.

¶34. "Though the general rule in Mississippi is that if a party is financially able to pay his attorney's fees he should do so, this is a matter which is entrusted to the chancellor's sound discretion." *Pittman*, 652 So. 2d at 1111.

¶35. It is reasonable to infer that the chancellor believed neither party had the ability to pay more than his or her own attorney's fees. Therefore, the chancellor did not abuse his discretion in failing to award Marie attorney's fees. Accordingly, this assignment of error on appeal is also without merit.

### -- CROSS-APPEAL --

## CROSS-ASSIGNMENT OF ERROR NO. 1

**THE CHANCERY COURT ERRED IN AWARDING MARIE AN EQUITABLE LIEN AND ERRED IN FAILING TO COMPLETELY DIVEST HER OF ALL HER INTEREST IN THE PROPERTY OR AWARD RAY AN EQUITABLE LIEN AGAINST ALL OF HER INTEREST IN THE PROPERTY.**

¶36. Roy cross-appeals, contending that the chancellor should have divested Marie totally from title to the subject property. He argues that Marie failed to contribute financially to the acquisition of the property and improvements and further that she failed to contribute any income to the marriage household during their twelve plus years of marriage. He, therefore, contends that he is entitled to ownership of all the real property and improvements thereon and that the chancellor erred in awarding Marie an equitable lien in the amount of $16,000.

¶37. This Court has applied the equitable theory of resulting or constructive trust to protect the community property interest of a wife in real property acquired in Mississippi solely in the husband's name. *Palmer v. Palmer*, 654 So. 2d 1 (Miss. 1995). This Court in *Stone v. Sample*, 216 Miss. 287, 62 So. 2d 307 (1953), applied the theory of resulting or constructive trust to protect the community property interest of a wife in real property acquired in Mississippi and titled solely in her husband's name. In *Stone*, the proof established that the funds used by Mr. Sample to purchase the Mississippi real estate were taken from a community account belonging to Mr. Sample and Mrs. Sample. *Stone*, 216 Miss. at 291, 62 So. 2d at 308.

¶38. In the case at bar, Marie testified that she put very little income into the marriage and no money towards the property. However, she did assist in the construction of the residence and rendered domestic services as homemaker during the marriage, and is therefore entitled to some equitable interest in the property.

¶39. It is clear that the chancery court has the authority to impose an equitable lien. *Lindsey v. Lindsey*, 612 So. 2d 376, 380 (Miss. 1992). *See Dudley v. Light*, 586 So. 2d 155, 159-60 (Miss. 1991); *Neyland v. Neyland*, 482 So. 2d 228, 230-31 (Miss. 1986). In discussing an equitable lien, the Court in *Lindsey* said:

> Characteristic of equitable liens is that they are not estates or property in the thing itself, nor are they rights to recover the thing, that is they are not rights which may be the basis of a possessory action. They are merely a charge on property for the purpose of security, and are ancillary to and separate from the debt. They are neither debts nor rights of property, but merely remedies for a debt. Of extreme importance is the fact that *such liens do not divest the debtor of title or possession*.

*Lindsey*, 612 So.2d at 380 (emphasis in original).

¶40. In *Draper v. Draper*, 627 So. 2d 302 (Miss. 1993), this Court held in part that:

> It is well-established by this Court that the chancery court has the authority to order an equitable division of property *that was accumulated through the joint efforts and contributions of the parties*.

*Id.* at 305-06 (citations omitted) (emphasis added).

¶41. Finally, in *Ferguson* this Court said, "fairness is the prevailing guideline in marital division." 639 So. 2d at 929. The *Ferguson* Court also said, "it must be remembered, the goal of the chancellor in a divorce case is to do equity." *Id.* at 934.

¶42. Considering this Court's recent pronouncement in *Ferguson* that fairness is to be the "prevailing guideline" in marital division cases and the particular facts presented to this Court in the case at bar, it is the opinion of this Court that the chancellor did not err in awarding Marie an equitable lien in amount of $16,000 on the subject property.

¶43. Therefore, this Court finds no merit to this argument on cross-appeal and holds that the chancellor did not err in awarding Marie an equitable lien in the amount of $16,000.

## CROSS-ASSIGNMENT OF ERROR NO. 2

## THE CHANCERY COURT ERRED IN AWARDING MARIE LUMP SUM ALIMONY.

¶44. "It is hornbook law that whether to award alimony and the amount to be awarded are largely within the discretion of the chancellor." *Creekmore v. Creekmore*, 651 So. 2d 513, 517 (Miss. 1995) (citing *Cherry v. Cherry*, 593 So. 2d 13, 19 (Miss.1991)). This Court will not disturb a chancellor's decision on alimony on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error. *Creekmore*, 651 So. 2d at 517 (citing *McNally v. McNally*, 516 So. 2d 499, 501 (Miss.1987). In *Cheatham v. Cheatham*, 537 So.2d 435, 438 (Miss.1988), the following factors were considered in awarding lump-sum alimony: 1) substantial contribution to accumulation of wealth by quitting job to become housewife or assisting in husband's business; 2) long marriage; 3) separate income or separate estate meager in comparison to that of payor spouse; and 4) financial security without lump-sum alimony. Most important is a comparison of the estates. Subsequent to the decision in *Cheatham*, this Court has consistently employed these four factors when reviewing lump-sum alimony. *Tilley v. Tilley*, 610 So. 2d 348, 352 (Miss. 1992); *Smith v. Smith*, 607 So. 2d 122, 126 (Miss. 1992); *Cleveland v. Cleveland*, 600 So. 2d 193, 197 (Miss. 1992). Disparity of the separate estates has continued to be the most compelling factor. *Tilley*, 610 So. 2d at 352.

¶45. No findings are provided to explain the chancellor's award of $2,500 in lump-sum alimony; however, it is reasonable to infer that this sum was awarded based on Marie's estimated monthly costs of living in the sum of $2,313.50, and was allowed in an effort to assist her getting a new start in California.

¶46. Generally, when there are no specific findings of fact, this Court often assumes that the chancellor resolved fact issues in favor of the appellee. *Newsome v. Newsome*, 557 So. 2d 511, 514 (Miss. 1990). This Court will also proceed on the assumption that the chancellor made determinations of fact sufficient to support its judgment. *Pace v. Owens*, 511 So. 2d 489, 492 (Miss. 1987). "In such circumstances this Court must look to the evidence and see what state of facts, if any, will justify the decree." *Id.* (citing *Boatright v. Horton*, 102 So. 2d 373, 374 (Miss. 1958)).

¶47. At the time of the hearing, Marie was sixty-five years of age, in relatively good health, and was

receiving Social Security payments of approximately $101 per month from Roy's premarital earned income. She was planning on moving to back to California to make a new life for herself.

¶48. Roy, at the time of the hearing, was a retired seventy-three-year-old heart patient with prostate cancer, incapable of gainful employment. He had no income other than retirement funds from Social Security and his teacher's retirement, which was earned prior to this marriage and at the time of the hearing amounted to $1,153 a month. Roy's daughter, who occasionally lived with him, gave him financial assistance to meet his monthly expenses.

¶49. Based on the foregoing authorities, it is the opinion of this Court that the chancellor acted within his discretion and did not commit reversible error in requiring Roy to pay Marie $2,500 in lump-sum alimony. Accordingly, this assignment of error on cross-appeal is without merit.

## CONCLUSION

¶50. It is the opinion of this Court that the chancellor did not abuse his discretion in divesting Marie of title to the marital home. There was clear and convincing evidence that Roy never intended to convey to Marie fee simple title to the subject property, but that he only intended for her to enjoy a life estate if they were still married at the time of his death. It is further the opinion of this Court that the chancellor did not err in failing to award Marie attorney's fees.

¶51. On cross-appeal, we hold that the chancellor's award of lump-sum alimony was not in error. The chancellor's award of $2,500 was a modest and conservative amount and within the discretion of the court. It is the further opinion of this Court that the award of an equitable lien in the amount of $16,000 was proper, supported by credible evidence, and was within the chancellor's discretion.

¶52. Accordingly, we affirm on appeal and on cross-appeal.

¶53. **AFFIRMED ON DIRECT APPEAL AND ON CROSS-APPEAL.**

**PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**